Our next case is Inguran, doing business as ST Genetics v. ABS Global, 2022-1385. Mr. Chin. May it please the Court, Julius Jenfer, appellant Inguran, LLC, also known as ST. In ABS 1, ABS stipulated to the only infringement claimant issue, namely direct infringement. On its face, the judgment that the parties negotiated to address that infringement, referring to, quote, a straw of sex semen sold by ABS, end quote, does not grant ABS the right to sublicense the 987 patent. But if there were any... There's certainly a forward ongoing royalty. That's true, Your Honor. That had to include something, and it seemingly was based in part on the expert's report, which talked about licensing and sales. Well, Your Honor, first of all, I think we would first go to the language of what the royalty is. And we think that on its face, when we're talking about straws of sex semen that are being sold by us, that just doesn't map on to a licensing or a sale of a GSS machine. Remember, it's a straw sold by ABS. It is not a machine sold by ABS. I think that is the difference as well. And when we're talking about ABS licensing to a third party, it's GSS technology for a third party to use. ABS is not selling a straw, and so it just doesn't match the language. But even if you want to say that this language could be interpreted in any other way and you have some doubt, we think that the judgment has to be read in a way that avoids running into legal limitations that are set forth in this court's precedent. And first and foremost, I would go to the ripeness concern that is very prevalent here. What we have in this case is ABS basically coming to court, and in its opening statement, it tells the jury what it wants to do is to deal with semen from its own bulls and to provide a sorting service to other bull studs. That refers to ABS actually performing the method. And the evidence that ABS offers in terms of whether or not it's induced infringement and sub-licensing claim would have been right for ST at this point is a document that is internal facing and which its deponent actually admits is an internal brainstorming document. That's Appendix 3347. That is not enough under this court's precedent. What the court's precedent says is that you have to have a concrete step to induce and you have to take meaningful preparation to induce. And so there's no bright-line rule. It is case-specific, but the court's precedents, like CAT-TEC, give plenty of examples of those types of concrete steps, for example, drafting literature. And here we simply have the opposite of that. You have a brainstorming document. And if there's any doubt, you don't have to take my word for it on this. I think it's telling that both the district court and ABS use the word considering. If you look at the court's decision below it, Appendix 6, and you look at ABS's brief at page 10, they say that what that evidence shows is that ABS was considering three different models. Under this court's decision in the Association for Molecular Pathology, this is cited on page 7 of our reply brief, it says that the word considering, if you are considering engaging in infringing activity, that is a classic case of something that is not right. Beyond the rightness concerns, I think you can see all of this reflected very easily as well in the trial record. I think the foundational fact to understand here is that there is a stipulation to direct infringement. There is no litigation over infringement itself. The only things that went to trial were the invalidity defenses and damages. So the baseline for what everybody is talking about, what the expert is talking about is ‑‑ Am I correct that at some point you obtained an injunction, correct? Is that right? Well, Your Honor, we obtained a royalty, so yes. In lieu of an injunction. Yes, correct. It's basically the same. Yes, yes, correct. I'm sorry for leaving. Yes. And an injunction enjoins, you can say that an injunction enjoins future conduct. Yes, that's true, Your Honor. Yes, yes. Well, why couldn't you have sought or extended this injunction to cover the sale of the technology itself? Well, Your Honor, I don't think that speaks to the rightness concern. It certainly doesn't solve that. Parties cannot go into court and say, hey, look, we have a direct infringement claim. We'd like to fold other things into the judgment. I think under this court's precedent, that's both an Article III problem and I think a district court, if it knew that was happening, would say, no, you can't come and litigate something that's not actually right. You can come in and say, I have evidence to show that the ABS is going to engage in this type of conduct. It's immediate. It's going to harm me. And it's against the public interest. All the classical elements of an injunction. Why couldn't you have done that? Well, Your Honor, because by ABS's own admission, they were only considering engaging in that context. And we don't disagree about the prospective nature of the case. But I think maybe it can be clarified by looking at the fact that the direct infringement claim, yes, there was a prospective remedy for that. But the reason there was a prospective remedy for that is because ABS stipulated to direct infringement. It said at trial that we would be competing today in terms of using the GSS technology ourselves. This is at Appendix 4251. And with respect to past infringement as well, they had, of course, already conducted the field trials. This is Appendix 3014 where they explain that in the trial record. And so I think there was a stark contrast by saying, well, look, there is some future infringement that's going to happen. Direct infringement was both stipulated to and ABS said very clearly we are going to continue doing this. So you need an ongoing loyalty that covers that conduct. By contrast, you cannot say the same thing about sublicensing. Now suppose that the parties had agreed in contemplation of the possibility that there would be this sublicensing arrangement, had agreed to a form of judgment that did include the sales by third parties of goods that were made pursuant to the technology, the licensed technology. Would there be any inherent flaw in that judgment? Well, Your Honor, as long as it would satisfy the rightness concerns, then. Well, but that sort of begs the question. The question is, would you say that that sort of judgment would go beyond what would be permissible for under Article 3 to have a judgment that affects conduct that has not yet gone beyond the stage of consideration? Well, not if it hasn't gone beyond the stage of consideration, because I think that that raises the Article 3 problem squarely. So you're saying that that kind of agreed upon judgment would have been impermissible? Yes, Your Honor. I think as a matter of Article 3 and also as a matter of this case law, this court has said time and again and has actually admonished district courts for going beyond what was actually litigated in the case. And so they've said, you know, you can't just say, you know, anything that infringes the patent can be included in the injunction. So there are legal limits here that go to what can be folded into the judgment. And again, courts are not permitted to just sort of say, look, we're going to have a private agreement about something that may or may not happen in the future that somebody is only considering. That is the classic formulation, in our view, of what is impermissible in the judgment. I'm also happy to talk about the expert report, which has been brought up. You know, I'd start with the evidence of the other potential expansion opportunities. I actually think this cuts in our favor when the expert is talking. This is shuttle coach or shuttle. Yes, that's yeah. Sure. Sure. I believe it showed a coat. Sure. And so what the expert is saying here is that I'm providing an opinion on direct infringement. That's that's the baseline for his opinion. That's that's what's been stipulated to. And so he is providing a damages and royalty analysis specific to that infringement. Consistent with Georgia Pacific factor six. He says, well, what are other others? The key word, other expansion opportunities. And so while Abia says, well, this this is just evidence that licensing was actually compensated for and that a sub licensing right was actually granted here. That's simply not true. On its face. The reasoning under factor six is that you take other opportunities and factor that into the royalty. Other distinguishes. It's the non patented activity at issue. I think the same thing can be said of their emphasis on the word unrestricted. Unrestricted does not mean that you have a sub licensing right when what is being litigated is direct infringement. And in fact, if you look at Appendix 828, A.B.S. is use it. The expert refers to A.B.S.'s use of G.S.S. technology. That doesn't say anything about other third parties using the technology. So we just don't think that the word unrestricted can be read in that way. The last thing I'd say, barring further questions, your honors, is that even if you were to think that the judgment could be read in various ways. What the district court did here is he said, look, I think it's reasonable for the judgment to encompass. Well, reasonableness, we think, has legal limits here. And those are the rightness concerns and the rule 65 concerns that we think should constrain the judgment. And so if there is any way to read the judgment in our favor, we certainly think it reads in our favor according to the plain text. But even if you think there is some sort of ambiguity in the words straw sold by A.B.S., you should read it to avoid those Article 3 and Rule 65 types of limitations. This is a factual matter. Has the sub-licensing and sales by third parties, has that that's already occurred in this case, to your knowledge? To my knowledge, yes. And when did that start, to your knowledge? To my knowledge, sometime after the judgment was entered. After 2017. Yes, correct. And presumably those, there's been no payment for those sales? Your Honor, that's unclear to me. Mr. Horowitz may know better on that. All right. Thank you. Mr. Horowitz. And we'll give you three minutes back to rebuttal. Mr. King. Could you, at the outset, could you clarify for me the question, the factual question, whether when this started, this licensing and sales by third parties, and whether any payments have been made? I assume not, but maybe you can clarify that. Why A.B.S. do S.T. pursuant to those sales? So I'm going to try to be clear about what's in the record and what's not as I answer the question. I do know the answer to the question. So what's in the record is that, for sure, there's a foreign licensing in Europe. We understand that. You understand that. Payments have been made for that. Yes. And the judge decided. After the district judge entered an order directing that payments be made for those. Correct. And how about the licensing? And just to be clear, incorporated. Domestic licensing for which straws were sold by third parties. Okay. So, and that was incorporated into the judgment. That's the preclusive one. That's the Europe one. In terms of domestic licensees, the record as it comes to the court is that there is no known existence of any licensing to date of domestic licensees. Okay. So there hasn't been. That's what the record is. They have in their preliminary injunction papers a supposition that it has happened, that there's been offers. They have a declaration from Juan Moreno that's in the appendix about how he heard that there's been some offers. As the case comes to the court, there's no evidence of such licensing yet occurring. The status of payments is actually even more complicated, and it's beyond the record, but also I, for confidentiality reasons, have limits to what I can say. The parties have settled the judgment in ABS 1. So in terms of the ongoing royalty today, there's no payments. There is a settlement that has resolved it. Was it a settlement that the parties incorporated the question of licensing and third-party sales into the settlement? The only thing that's public that I can say is that the judgment has been satisfied. The judgment as construed by Judge Connolly or the judgment as construed? That's how I would read it, but they might read it differently. Okay. So that's where it is. Judge Rainer, I'd like to start with the question that you raised, which is couldn't they have asked for this royalty on an ongoing basis? Our position is that they absolutely did. They decided in ABS 1 to litigate the question of the licensing program. Now, they say it's unright. They couldn't possibly have done it, but that's not what they told the jury. At that time, was there evidence that a third party was interested in the technology, in licensing the technology? So the key evidence that I would point you to, which is at, I believe, Joint Appendix page 5785, is what their damages expert told the jury. What the damages expert told the jury is that ABS decided, past tense, when they commercialized the technology, they would offer licenses. Didn't say it in the abstract. They said it very specifically to three customers by name, Cogent, CMEX, Koyaki. Then the damages expert went on to say, and they had a projected royalty rate, $2.05. So the idea that this is an abstract, someday-in-fringe concept is totally inconsistent with the evidence that was before the jury. But that went to the question of what the right royalty rate is, i.e., compare with other royalty rates, including the $2.05, right? That didn't go to the question of whether they were ultimately litigating the question of inducement. As I understand it, there was no inducement presented to the jury, no instructions on inducement. The jury was not asked to rule on inducement. This was a direct infringement case from beginning to end, was it not? Well, when you say from beginning to end, that includes the judgment in 2020 that clearly includes at least what you said. No, beginning to end of the trial. When this trial ended, the determination was made with respect to direct infringement. There was never any instruction or verdict, as I understand it, on induced infringement. There was no instruction on any infringement. Infringent was stipulated for past infringement. With respect to future infringement, which is the subject of the reasonable royalty, right? That's an injunction, first of all. That's the nature of the order. The district judge is the one who entered the order, and they entered it based on the royalty that was decided by the jury for future infringement. What kind of future infringement? The only thing that had happened so far is direct infringement for internal research purposes. The future royalty was based on activities that were all planned future activities. And the number, you might say, their position is it would have been higher for inducement and lower for direct. They could have made that argument. They could have asked for different rates. They asked for one blended rate based on all of the anticipated uses of the technology. And this wasn't just like a hypothetical. It might happen, and we want to think about it. It strikes me if the idea of inducement was really in the party's minds at that point, if that was really part of the way the parties viewed the litigation, including Judge Conley, the judgment would not have said sold by ABS. That language sounds very restrictive to me. Does it seem like it includes ends sold by third parties pursuant to the use with the permission of ABS technology? So I'd say a couple of things about that. First, as the evidence came in, it wasn't an afterthought. It was a key sort of thematic point. They used the words, they're planning to displace XY, which is the company that licenses the technology to ST. They're planning to displace XY with their own technology and go to XY's licensees and take them away. It's not an abstract background concern. It's part of it. Now what about the language? The language sold by, if you're just coming to this fresh with no background on the case or on the law, I grant you it might be read that way. But there are a few things cutting the other direction. First, we know from page 1522 of the Joint Appendix that the parties didn't restrict it to literally straws sold by ABS. They included straws sold by third parties for whom ABS did the processing, and they treated the processing event as the same. No, I'm talking about domestic processing for third parties, the fee-for-service model. Both of these hadn't happened. There hadn't been a single customer for fee-for-service, and there hadn't been a single customer for licensing. These were two alternative go-to-market strategies in the same document that Mr. Chen identified as hypothetical. They were different go-to-market strategies. One was fee-for-service. One was licensing. Neither had happened. Both are part of the judgment. It's undisputed that fee-for-service is, and we have that record at 1522 where we confirm it. And then the foreign licensee point, that's part of the judgment. Now, Judge Bryson, you might have viewed it differently if you were the district court entering the judgment in the first instance. You might have used different language. But this district judge understood his own order to encompass production by foreign licensees that are then incorporated into the U.S. So he's imported into the U.S. And that's incorporated into the judgment already expressly in the 2020 reentry, which is the preclusive judgment here. So we have an undisputed fee-for-service as part of sold. That's not selling, but it counts. We have undisputed importation of foreign licensee production. Doesn't sound like sold, but it counts. And we have ST's own position below, which they concede again on a fee-for-service. If that's what you're referring to, it was processed overseas and returned to the U.S. for sale by ABS. So that's sold by ABS, surely. Yes. It is within the scope of the judgment, and I agree with you. That's fine, and it's incorporated in the scope of the judgment. Even though foreign licensee processing wasn't part of it, and their position was that this wasn't known at the time, that has been determined, and it is preclusively determined. The last point is their position below, and they conceded on appeal as well, is that sold by, in this context, they cite the case TransOcean, which is cited throughout the briefs. It's a district court case. Sold is ordinarily understood to include things like licenses and leases. TransOcean, that's Judge Rosenthal's case, right? I believe that's right. That's a case in which you're talking about whether licensing a machine is equivalent to selling the machine. Not licensing a machine, which results in sales by someone else, is equivalent to sales of the things sold by the licensee. So the context of the licensing here is actually quite similar to the parallel that you were just drawing in the Rosenthal case. So when we talk about fee-for-service model and the licensee model, let me describe what happens on the ground. In either event, ABS makes the machine. It's the same machine. It's the accused technology. They make the machine. The customer doesn't make it. For both models, ABS makes the machine. They deliver it to the customer. In both models, a fee-for-service model or a licensee model, and this is throughout the ABS 1 trial record, because of the nature of the animal genetics at play, you want the machines close to the animals. So if the animals are in a different state, ABS will make the machine, deliver it to the customer's location in a different state, and that's ST's whole business. They do the same thing. In a fee-for-service model, the machine sits at the customer's location. It's operated by people who are paid by ABS and are instructed by ABS how to operate the machine. In a licensee model, the same machine sits in the same spot, right, but it's operated by people who are paid by the customer and instructed by ABS how to operate it. So it's not like a sub-licensing arrangement where it's we're just licensing the technology and see you later. It's really a function of the same exact activity undertaken by people who are wearing ABS name tags or wearing a different name tag. So it's much more like the Rosenthal safety situation. The role tags do matter, do they not? You could have, in this case, if ABS were to hire a much larger staff in order to deal with the problem of trying to have a wider distribution, rather than doing the licensing, there'd be no doubt that the sales by ABS, pursuant to their larger staff, would be covered. But it does matter who's doing the actual selling. So this goes to sort of a point of basic economics as they describe it in their briefing. As a matter of basic economics, inducement actually is going to be different. That's sort of what's behind your question. Two observations. Number one, in the Glen Eyre Electronics case, this court more or less said the opposite. After a trial on direct infringement, they wanted a trial on induced infringement, and this court said the damages are going to be the same, whether it's direct or induced based on the nature of the activity. So too here. The second point is, even if you don't agree with that, the law or the economics of it, we have a decision that ST made. I mentioned this before. They could have sought separate rates for the licensee model, which they said, again, not abstract. ABS had decided to license to XY licensees at a particular price. They could have said, that activity hurts us more. It's worse. We want an injunction as to that activity, or we want a higher royalty. What's the page that you cited, I think you did, for the idea that they had already decided to license? Because my reading of Shuttlecotty's report was this was something they were considering, not something that had actually been decided. So it's 5785? 5785. 5785. And what it says is, as we know, the ABS – Who's this? This is Shuttlecotty testifying. As we know, the GSS technology is what's being accused in this case. My understanding is that GSS – excuse me – that ABS, GNS, once they commercialized the technology, decided that they would license it. You'll see in the box at the top right, he's referring to a slide, it says their intent was to license the technology to current XY licensees. He names them. Cogent, CMEX, and Goyaki. So almost to try to displace XY with their own technology. Judge Bryson, in this respect, the case is just like the Forest Labs case, in which CIPLA, in that case, this is the Lexapro case, comes in and says on appeal, the judge enjoined our induced infringement. We're not doing any inducement. This is a hatch-waxman case. Nothing's been sold. Isn't that what you read, the statement of the expert? At bottom, it's just speculation. I mean, nobody knows what's going to happen in the future. They could license the technology, or they could not. Not even the expert knows. As learned as they are, it doesn't have a crystal ball. Absolutely. The future is hard to predict. I'll agree with that. Yeah. Well, how can you base a cause of action on something that hasn't happened yet? I mean, it seems to me that you're arguing against a very basic notion in risk-judicata cases or claim conclusion dealing with transaction. You have to deal with the same transactional facts. And here, you're not dealing with the same transactional facts if you're going to build in, if you're going to import in this type of speculation. Look, number one, he said it was decided. We might have objected that it was speculative. We didn't. That was the evidence before the jury. But the question of what was actually the transaction, what was litigated... It's actual words. What he actually says is that they may. It could happen. No, what he said was they decided they would license. But let me go to the broader point. What he's saying seems to me that it's only natural that in the future they could go on and license the technology. So that's how you interpret it, and that's fair? Let me just say that the district judge... I'm asking you. Yes, and what I'm saying is it's not how I interpret it, but more importantly, the district judge, who's the one who issued the injunctive relief and presided over this trial, he decided that they already pursued these claims in that case, and the interpretation of his own injunctive relief is something that this Court gives deference to. I want to make two additional points. Did the district court decide that the transactional facts are the same? That's what it means when the district court... I mean, did he say that? He didn't use the word that the transactional facts were the same. He was presented with the case law around race judicata, and what he said was page 7 of the Joint Appendix. They knew about it. They made this part of their royalty ask, and the judgment incorporates it. Does he ever say that we're dealing with the same transactional facts? He doesn't use those words. But that's the law. That's an element of the test, right? But what he said was this was already litigated in ABS-1, and the question of what was litigated in ABS-1 is one that he is uniquely well-situated to answer. If I may, I'd just like to make two remaining points in my remaining time. What I was going to say about the Forest Labs case is that CIPLA's point there was that inducement hadn't happened. Nonetheless, this court affirmed the injunction based on the planned commercialization that included CIPLA doing this activity. It's the same thing here. It's a plan for commercialization. It might not happen. The last thing I wanted to say, Judge Bryson, goes back to your question earlier, could we have agreed the parties to an injunction even if it was sort of unripe in a sense? There's no question that the court had jurisdiction over the matter, and here we go to the Supreme Court's 1928 decision in Swift against the United States. Once the court has jurisdiction to settle the matter, the power to enjoin includes the power to enjoin too much. If they thought the injunction was overbroad, they could have appealed it, but they didn't. There's no jurisdictional problem with an injunction that turns out to have been overbroad. Wouldn't you have to show a likelihood of success if you bring an injunction? For purposes of a preliminary injunction, yes. This is a permanent injunction so that success was given by the judgment. How can you show that you would have, you would succeed in a cause of action on conduct on an event that has yet to occur? We stipulated to infringement likelihood of success in the merits as part of the preliminary injunction analysis. This is a permanent injunction following a determination of infringement, and the nature of the infringement was discussed at trial in the damages trial. It was not abstract. It had been decided with specific customers at specific prices. Thank you, counsel. Mr. Chen, you have three minutes. Three minutes. Thank you. Let me make two points. First, I'd like to start with Appendix 5785, which seems to be the primary, if not only, evidence that ABS is relying on for both its ripeness points and, I think, for its actually litigating. As I think some of the questions have probed, what the expert is doing here is providing context for a direct infringement data point. He is saying, what is out there in the market to inform my hypothetical negotiation analysis in terms of one party licensing its technology to another? That is direct infringement. Nothing more. He's not factoring in, in that $2.05, anything about infringement. So, for example, what ABS would have to pay upstream to ST to sublicense the 987 patent. And I think that's really the telling thing more broadly, which this excerpt, I think, really represents. You don't see anything in the record that talks about the harms that you would expect an expert to be discussing and the remedy that he would be opining on for sublicensing and induced infringement. You don't see him talking about what ST would be paid as a royalty in terms of ABS selling GSS machines themselves. That's a separate line of revenue that ST would be entitled to under the laser dynamics piece. You don't see anything about sublicensing. Once ABS is adjudged to be an infringer, it's not just charging the $2.05 that it thought it might when it thought that it could get past the patents. Keep in mind that it said that it didn't think it actually, while it stipulated to the infringement, didn't think the patents were valid. So when it's talking about this $2.05 back in 2014 in this internal presentation, it is not saying that, well, if we were to sublicense and to gain the separate right to do that, how much would that cost? You don't see anything about that. And with respect to market harm, you don't see the expert in this passage or elsewhere say anything about the harms that would be visited on ST if ABS were able to basically stand in the shoes of ST and say, we now have the 987 patent, we can license it to as many people as we want, and perhaps they can even use it to sort... Third parties could use the 987 patent and GSS technology to sort for other parties. The only other thing I would say... This is a forced license situation, right? That's correct. And the question, isn't it one way of looking at this to say, well, what is the scope that the forced license should have? And your argument, the other side is saying the forced license should include any way that ABS has of exploiting the technology, and your argument is, no, it only applies to the form that you say was litigated for exploiting the technology. Which brings us right back to the question of, is it reasonable to say that this forced license included more than just the sales, in the conventional sense, by ABS? How about the question of fee for service? Fee for service in terms of it being... Why does that fall within the sold by ABS rubric? Well, Your Honor, I think it fits squarely within. It's ABS using its own technology and charging a fee to produce straws. Is it producing straws in their situation? Yes, Your Honor. ABS is actually producing and then selling the straws, or is it... Yeah, so it's one of two things, and perhaps the first doesn't strictly fall within fee for service, but it's either sorting for itself with its own bull studs, right, or it is taking a third party's unsorted semen and then producing a straw using GSS technology. The third party does not do any sorting, and then it gives the straw to the third party. And the third party pays the fee. Yes, correct. And so that's why the language of the judgment reads exactly as you would expect. Yes. Counsel, thank you both for your arguments. The case is submitted.